UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MICHAEL M.,[1]

                    Plaintiff

-vs-

COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.
_____

DECISION AND ORDER

1:19-CV-1318 CJS

INTRODUCTION

      This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") which denied the application of Plaintiff for Supplemental Security Income ("SSI") benefits. Now before the Court is Plaintiff's motion (ECF No. 12) for judgment on the pleadings and Defendant's cross-motion (ECF No. 15) for the same relief. For the reasons discussed below, Plaintiff's application is denied and Defendant's application is granted.

STANDARDS OF LAW

      The Commissioner decides applications for SSI benefits using a five-step sequential evaluation:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers

---

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

1

> such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment]. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.[2] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform. The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted)

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim. In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West). Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402,

---

[2] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of

the evidence, but the deferential standard of review prevents us from reweighing it."); see also, Riordan v. Barnhart, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action. The Court will refer to the record only as necessary to address the errors alleged by Plaintiff.

Plaintiff was born in 1964 and was 53 years old as of the date of the administrative hearing. Tr. 44. Plaintiff stopped attending school while in or around the seventh grade. Tr. 46.[3] Plaintiff later attended GED classes while in prison, but never achieved an equivalency diploma. Tr. 46. Plaintiff has no significant work history, as he was incarcerated for twenty-five years. At the time of the hearing, Plaintiff resided alternately with his sister and with his girlfriend, both of whom performed all household chores for him. Tr. 44, 65.[4] Plaintiff does not drive and uses public transportation. Tr. 66-67.

Plaintiff has medical conditions including learning difficulties, history of right hip fracture that was surgically repaired in 1978, muscle spasms in the back, history of left elbow fracture with surgical repair in the "late 1980s," numbness in his left fingers, ganglion cyst of the left wrist, back pain radiating into his knee, and problems with his thyroid. Tr. 41-42. Additionally, four

---

[3] At the administrative hearing Plaintiff stated that he had made it to the 8th grade, though his lawyer insisted otherwise, and several office treatment note indicates that he left school in the 10th grade. Tr. 782.
[4] There was no indication that Plaintiff was unable to perform these chores for himself, only that he did not perform them since others performed them for him.

4

months prior to the administrative hearing Plaintiff was diagnosed with a left ankle fracture, which was surgically repaired. Tr. 42, 57.  Since his ankle surgery, Plaintiff has used a cane to ambulate. Tr. 59. Plaintiff claims to be in constant pain, at a severity of nine on a scale of one-to-ten, even when taking pain medication. Tr. 49.[5]  Plaintiff mentioned to one of his doctors that he had a history of cocaine abuse, though he denied any current use of alcohol or drugs.

On January 14, 2016, Donna Miller, D.O. ("Miller") performed a consultative medical examination at the Commissioner's request. Tr. 337-340.  Plaintiff told Miller that his chief medical complaint was pain in the right hip and left elbow, which was "8 out of 10 intensity." Tr. 337.  Plaintiff stated that activity such as "prolonged standing and walking" increased his pain. Tr. 337.  Plaintiff indicated that he was otherwise healthy and did not mention any mental problems or problems with his thyroid.  Upon examination, Miller observed that Plaintiff was in no apparent distress, and that he had normal neurologic findings, normal gait with no assistive devices, normal stance, ability to rise from a chair without difficulty, full strength in all extremities, no muscle atrophy, intact hand and finger dexterity and full strength in both hands. Tr. 339. Miller's musculoskeletal exam was essentially normal. Tr. 339.  Miller's prognosis was "stable," and her diagnosis was right hip pain and left elbow pain, both with "history of fracture and surgery." Tr. 339.  Miller's medical source statement, in its entirety, was as follows: "The claimant has mild limitation with heavy lifting, bending, carrying, kneeling, squatting, pushing and pulling." Tr. 339.

---

[5] Plaintiff's testimony that his medications did not help his pain is inconsistent with his statement to an emergency room doctor on March 4, 2018, when he indicated that his pain was "well controlled" with Lortab and naproxen. Tr. 712.  Plaintiff also indicated that he slept well at night and that constipation was the only side effect he experienced from his medications. Tr. 64.

On February 12, 2016, Janine Ippolito, Psy.D. ("Ippolito") performed a consultative psychiatric evaluation of Plaintiff at the Commissioner's request. Plaintiff traveled alone by public transportation to the appointment. Plaintiff told Ippolito that he had completed school through the eighth grade,[6] and reported that he had "a history of learning problems" and had needed assistance completing the forms to apply for disability. Tr. 345. Plaintiff had no history of mental health treatment. Tr. 345. Plaintiff stated that he had last been employed in 2010, when he worked for three months in a laundry facility. Plaintiff indicated that he had quit that job not because he was unable to perform it, but because he was upset over the death of his mother. Indeed, Plaintiff told Ippolito that the only non-exertional reason he was *presently* unable to work was because he was still upset over his mother's death: "The claimant reports he is unable to work at this time due to a depressed mood related to the death of his mother, as well as chronic pain when standing, walking and sitting."[7] Tr. 345. Plaintiff indicated that he was able to care for himself, that he had normal relationships with friends and family, that he enjoyed playing cards and watching movies, and that "he spen[t] a typical day lying in bed, watching tv and napping." Tr. 347.

Upon examination, Ippolito reported that Plaintiff was cooperative, his social skills were adequate, he was well groomed, his speech was fluent, his thoughts were coherent and goal directed, his affect was full and appropriate, his mood was neutral, and he was alert and oriented. Tr. 346-347. Ippolito stated that Plaintiff's attention and concentration seemed "impaired due

---

[6] Plaintiff also testified to this at the administrative hearing, though his attorney argued that there was no evidence that he ever completed seventh grade.
[7] This is consistent with Plaintiff's testimony at the hearing, discussed below, where he indicated that he was unable to work due to physical problems. The argument that Plaintiff is also prevented from working due to a learning disability appears to a position taken primarily by Plaintiff's attorney.

6

to suspected limited intellectual functioning," in that he was able to do counting and one-step calculations "without errors, but had difficulty with a two-step calculation and serial 3s subtraction task." Tr. 347.  Ippolito also indicated that Plaintiff's memory skills seemed impaired due to limited intellectual functioning, in that he "recalled 3 out of 3 objects immediately and 1 out of 3 objects after a delay." Tr. 347.  Ippolito estimated that Plaintiff's cognitive functioning was below average, and that his general fund of information was "somewhat limited." Tr. 347.  Ippolito found Plaintiff's judgment and insight to be fair. Tr. 347.

Ippolito's mental diagnosis was "unspecified depressive disorder with anxious distress. Rule out specific learning disorder." Tr. 348.  Ippolito's prognosis was "fair to good given [the] low severity of symptoms." Tr. 348.  Ippolito's medical source statement was as follows:

> The claimant presents as able to follow and understand simple directions and instructions, perform simple tasks independently, maintain a regular schedule, perform complex tasks independently, make appropriate decisions, and relate adequately with others with no evidence of limitations.  He can maintain attention and concentration and appropriately deal with stress with mild limitations.  He can learn new tasks with mild to moderate limitations.  These limitations are due to his suspected cognitive deficits and emotional distress.
>
> The results of the present evaluation appear to be consistent with psychiatric problems, but in itself this does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis.

Tr. 348.

Ippolito's mild findings were essentially confirmed by Plaintiff's testimony at the administrative hearing, where, despite his history of learning problems in school, Plaintiff testified that he needs no assistance remembering to take his medications or to attend doctor's appointments, that he had no problem with paying attention or staying on track when performing

tasks, and that he can follow a routine, such as a work routine, without constant supervision. Tr. 61, 63-64. Plaintiff also stated that he has difficulty with reading comprehension, but that he can understand and follow directions when they are explained to him orally. Tr. 63, 64. Despite Plaintiff's testimony on these points, Plaintiff's attorney attempted to establish that Plaintiff would be off task too much of the time, which would prevent him from maintaining competitive employment. However, Plaintiff did not indicate at the hearing that his alleged mental impairment would prevent him from working, but, rather, he indicated that he would be unable to work due to pain, the inability to lift repetitively, the need to change position and the need to elevate his leg. Tr. 69-70, 72-74.

As mentioned above, shortly before the administrative hearing Plaintiff fractured his ankle, requiring orthopedic surgery. In that regard, on March 4, 2018, Plaintiff presented at the emergency room ("ER") complaining of left ankle pain. Tr. 712.[8] Plaintiff declined any pain medication and stated that he thought an insect might have bitten his ankle. Tr. 717. ER treatment notes indicate that upon orthopedic exam, Plaintiff had no pain or abnormalities of his right leg, and full strength and range of movement in both upper extremities. Tr. 720. X-ray testing showed an ankle fracture, which was "reduced," that is, set, "at bedside," and that Plaintiff was discharged in "good condition" with a splint and crutches. Tr. 715, 722. However, Plaintiff was told that the fracture was an "unstable type" that would likely require "surgical fixation." Tr. 722. On March 6, 2018, Plaintiff had "open reduction" orthopedic surgery to repair the fracture, with implantation of a "fibular locking plate" to stabilize the fracture. Tr. 731. On March 19, 2018,

---

[8] Plaintiff denied any back pain, arthritis, headaches, numbness or "psychosocial history." Tr. 712-713. The attending doctor noted that Plaintiff's judgment and insight were appropriate and that his strength was normal. Tr. 713.

8

it was noted that Plaintiff's left ankle was able to bear weight, and he was given exercises to increase the range of motion in the ankle. Tr. 736 ("He can weight bear as tolerated.").

On April 3, 2018, Meggan Shae, FNP-BC ("Shae") completed a report concerning Plaintiff's ability to work post-ankle-surgery. Tr. 741-744. As for specific limitations, Shae indicated that Plaintiff could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds; stand for up to one hour at a time, and for 4 hours total in a workday; sit for up to two hours at a time and for four hours total in a workday; rarely climb, balance, stoop, crouch or kneel and never crawl; and never be around heights, moving machinery or temperature extremes. Shae indicated that Plaintiff's ability to reach, push and pull was affected by his conditions, but not his ability to handle or feel. Tr. 743. Shae indicated that Plaintiff would need a ten-minute rest period every two hours. Tr. 742. Shae concluded her report by stating, "Patient may work in a light level of exertion. However, currently [he] is temporally totally disabled due to acute injury," referring to his ankle fracture. Tr. 744. Shea further checked a line indicating that Plaintiff had been unable to engage in substantial gainful employment since December 9, 2015. Although, that opinion is not consistent with her statement that Plaintiff would be able to work at the light exertional level but for his recent ankle fracture.

When asked to explain the findings that supported her opinion, Shae attached 76 pages of office notes dating as far back as April 2016.[9] Tr. 745-820. Those notes generally indicate that Plaintiff had regular follow-up appointments at which he complained of chronic pain in his hip, elbow, left wrist and back. The notes further indicate that Plaintiff was attending physical

---

[9] Leaving Shea's opinion that Plaintiff has been unable to work since *2015* unsupported. Regardless, determinations regarding disability are reserved to the Commissioner.

therapy "with good effect," and that his pain medications reduced his pain, though he still typically complained of pain in the range of 8 on a scale of one-to-ten. *See, e.g.*, Tr. 808, 816.  With perhaps one exception, the attached notes do not contain results of physical examinations or other testing but generally list Plaintiff's vital signs and subjective complaints.[10]  Although, some of the notes reference Plaintiff having an antalgic gait and decreased range of motion on the lumbo-sacral spine. *See, e.g.*, Tr. 761.  Contained within the notes is a "pre-op report," completed by Shea in preparation for Plaintiff's hernia surgery, purporting to list his medical history and concerns. Tr. 757-758.  The pre-op report lists Plaintiff's chronic conditions as "hyperparathyroid" with parathyroidectomy in 2015, elbow surgery in 1988 and hip surgery in 1978. Tr. 757.  The report indicated that Plaintiff claimed to have low back problems, arthritis, anxiety, but that he was "feeling well," and had normal neurologic signs, a positive mood, and a "moderate" exercise tolerance, meaning that he could climb up to three flights of stairs. Tr. 758.  On June 6, 2018, Shea reported that post-surgery, Plaintiff's range of motion in the left ankle was "mildly decreased." Tr. 825.

Following the administrative hearing, at which Plaintiff appeared with his attorney and both he and a vocational expert ("VE") testified, on August 3, 2018, the ALJ issued a written decision denying Plaintiff's claim for SSI benefits, and concluding that he was not disabled at any time between the date of his application (November 9, 2015) and the date of her decision. The ALJ applied the five-step sequential evaluation discussed above and, in pertinent part, found that Plaintiff had the following RFC, as restated by Plaintiff in his supporting memo of law:

---

[10] The "physical examination" sections on most of the notes is left blank.

10

> Plaintiff retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b), except that: he requires a cane for ambulation; he can walk for four hours, and sit or stand for six hours per an eight-hour workday; he is limited to occasionally lifting fifteen pounds and frequent lifting or carrying of ten pounds; he can alternate between sitting and standing once every hour for five minutes without increasing time off task; he is limited to occasional pushing and pulling; he is limited to occasional climbing of ramps and stairs; he is limited to occasional balancing on level surfaces; he is limited to occasional stooping (i.e. bending at the waist) and kneeling but never crouching (i.e. bending at the knees) and crawling; he is right hand dominant; he is limited to frequent but not constant reaching including overhead, in front and/or laterally for the left upper extremity; he is limited to frequent but not constant handling (including gross manipulation), fingering (including fine manipulation) and feeling for the left hand; he can never tolerate exposure to unprotected heights and moving machinery or moving mechanical parts; he should avoid exposure to extreme cold and wetness; he is able to carry out and perform simple routine, repetitive tasks and follow simple job instructions, i.e. perform one and two-step tasks and going the same tasks everyday with little variation in location, hours or tasks; he can work in a low stress environment (meaning one with no supervisory responsibilities; no work at production rate pace and no fast-moving assembly line-type work; no independent decision-making required except with respect to simple, routine decisions; and with few, if any, work place changes in work routines, processes or settings); he can perform work that would not require a high level of attention to detail; he can perform work that does not require travel to unfamiliar places; he can perform work that is subject to no more than occasional supervision; and spoken/verbal instructions is the preferred method to receive instructions.

Pl.'s Mem. of Law at pp. 16–17.

In explaining this RFC finding, the ALJ noted in pertinent part, first, that she had considered all medical opinion evidence in accordance with 20 C.F.R. § 416.927. Next, the ALJ gave partial weight to Dr. Miller's opinion, noting that it was consistent with the record, but that Miller had only examined Plaintiff once and did not have the benefit of later treatment records. Tr. 27. The ALJ similarly gave partial weight to Dr. Ippolito's opinion, again, because, though it was consistent with the record, Ippolito had only examined Plaintiff once and did not have the

11

entire record before her. Tr. 27.  The ALJ assigned moderate weight to Nurse Practitioner Shae's opinion, noting that most of the limitations expressed therein were supported by the treatment records. Tr. 27.   However, the ALJ gave no weight to Shae's opinion that Plaintiff was temporarily totally disabled, since that was a determination reserved to the Commissioner. Regarding the credibility of Plaintiff's testimony and complaints, the ALJ discussed his statements and summarized those relating to his mental impairment as mainly indicating that he had difficulty reading. Tr. 28.

The ALJ went on to find, at steps four and five of the sequential evaluation, respectively, that Plaintiff had no past relevant work, but that with the RFC set forth above he could perform other jobs that existed in sufficient numbers in the national economy.

In this action, Plaintiff asserts primarily that the RFC finding was erroneous since the ALJ failed to develop the record in two ways: By failing to obtain an intelligence test and by failing to obtain an updated medical opinion after Plaintiff broke his ankle subsequent to the consultative medical examination.   Plaintiff also contends that the ALJ erred by selectively "cherry picking" information from Shae's medical opinion when making the RFC determination.

Defendant disputes Plaintiff's arguments and maintains that the ALJ's decision is free of reversible legal error and supported by substantial evidence

The Court has carefully reviewed and considered the parties' submissions and finds, for the reasons discussed below, that Plaintiff's arguments lack merit and that the Commissioner's decision should be affirmed.

DISCUSSION

Development of the Record

As just mentioned, Plaintiff argues that the RFC finding was erroneous since the ALJ failed to develop the record in two ways: First by failing to obtain an intelligence test and second by failing to obtain an updated medical opinion after Plaintiff broke his ankle subsequent to the consultative medical examination.

It is of course well settled that an ALJ has a duty to develop the record in certain instances, and that the ALJ's failure to do so may warrant a remand: "Where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel or by a paralegal. The ALJ's duty to develop the record reflects the essentially non-adversarial nature of a benefits proceeding. An ALJ's failure to develop the record warrants remand." *Guillen v. Berryhill*, 697 F. App'x 107, 108 (2d Cir. 2017) (citations and internal quotation marks omitted).  However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Guillen v. Berryhill*, 697 F. App'x 107 at 108.

Additionally, reversal may be appropriate where the Commissioner's decision to deny benefits rests on a consultative opinion that was "stale" because it was rendered on an incomplete record, particularly where subsequent developments in the medical evidence cast doubt on the accuracy of the opinion:

> In *Hidalgo v. Bowen*, under the regulations then in effect, the Second Circuit rejected an ALJ's decision that relied exclusively on the opinion of a non-examining consultant, in part because the non-examining physician reviewed a limited record that did not include subsequent clinical findings, such as clinical notes of a treating

13

> physician and hospital records including X-rays. *Id*., 822 F.2d 294, 295–96, 298 (2d Cir. 1987). Because this subsequent evidence "confirmed" the RFC determination of the primary treating physician and "may have altered [the non-examining consultant's] conclusions," the Second Circuit remanded to the ALJ. Id. at 298. But in *Camille v. Colvin*, the Second Circuit reached the opposite conclusion in a non-precedential opinion, rejecting an argument that a non-examining source was "stale" solely because a non-examining source did not review later submitted evidence where "th[at] additional evidence does not raise doubts as to the reliability of [the non-examining source's] opinion." 652 F. App'x 25, 28 n.4 (2d Cir. 2016) (distinguishing *Hidalgo*, 822 F.2d at 295–96, 298). In that case, because the later opinion evidence did not differ materially from the opinions that the non-examining physician did consider, the Second Circuit found that the ALJ committed no error by relying on the non-examining physician. *Id*.

*West v. Berryhill*, No. 3:17-CV-1997 (MPS), 2019 WL 211138, at *5 (D. Conn. Jan. 16, 2019) (footnote omitted).

Here, Plaintiff argues, first, that before making the RFC finding, the ALJ should have ordered intelligence testing "as recommended by Dr. Ippolito."[11] Although, that argument is phrased somewhat disingenuously since Ippolito never "recommended" such testing or indicated that her opinion was in any way contingent upon further testing.  Plaintiff here may be referring to the fact that Ippolito's diagnosis was "unspecified depressive disorder with anxious distress. *Rule out specific learning disorder*." Tr. 348 (emphasis added).   However, that was a diagnosis, not a recommendation.   Moreover, while Ippolito's report made specific recommendations, obtaining intelligence testing was not one of them. Tr. 348.[12]

In any event, the Court finds that the ALJ was not required to develop the record by obtaining intelligence testing since none of the factors that trigger such a duty were present.

---

[11] Pl. Memo of Law at p. 18.
[12] "RECOMMENDATIONS: Consider referral for individual psychological therapy to assist with mood management.   Refer for vocational training and rehabilitation."

14

That is, there were no obvious gaps in the administrative record, and the ALJ already possessed a complete medical history.

Moreover, such further testing would have been redundant, since even if it confirmed that Plaintiff had below average intelligence, Ippolito had already made that assumption [13] and nevertheless concluded that Plaintiff's symptoms ability to perform the mental demands of work was only mildly impacted.[14]  Additionally, the ALJ adopted the limitations that Ippolito had recommended based on Plaintiff's "suspected cognitive deficits and emotional distress." Tr. 348.[15]  Furthermore, Ippolito's findings were supported by Plaintiff's hearing testimony, in which he indicated that his learning impairment primarily manifested itself in poor reading skills, and that he was otherwise able to understand and follow instructions, stay on task and maintain a routine.[16]  For all of these reasons, the Court concludes that the ALJ did not err in failing to obtain intelligence testing.

The Court also finds that the ALJ did not err in failing to obtain additional medical opinion evidence after Plaintiff fractured his ankle.  On this point, Plaintiff essentially contends that following his ankle fracture in 2018, the ALJ should not have relied on Dr. Miller's opinion, rendered in 2016, since it had become "stale."  However, the ALJ assigned only partial weight

---

[13] As mentioned already, Ippolito estimated that Plaintiff's cognitive functioning was below average, and that his general fund of information was "somewhat limited." Tr. 347.
[14] For example, Ippolito's prognosis was "fair to good given [the] low severity of symptoms," Tr. 348.
[15] Because Ippolito recommended such limitations, the assertion in Plaintiff's brief, that "there is no testing *or opinion evidence* in the record that specifically evaluates the impact that Plaintiff's intellectual disorder would have on his RFC," is incorrect. Pl. Memo of Law at p. 20 (emphasis added).
[16] As already discussed, Plaintiff testified that he had no problem with paying attention of staying on track when performing tasks, that he can follow a routine, such as a work routine, without constant supervision, and that while he has difficulty with reading comprehension, he can understand and follow directions when they are explained to him orally. Tr. 63-64. This is also borne out by the fact that Plaintiff previously held competitive employment in a laundry, until he quit after his mother's death.

to Dr. Miller's opinion precisely because Miller had not had the benefit of seeing Plaintiff's later treatment records. Tr. 27. In other words, to the extent that Miller's opinion was "stale," the ALJ factored that into her decision. Moreover, the ALJ gave more weight to the opinion of Shea that was rendered after Plaintiff's ankle repair surgery. Indeed, the ALJ's RFC finding largely mirrors the limitations contained in Shea's report.[17] In any event, Plaintiff does not suggest that the opinion of Shea, a treating nurse practitioner, was in any way stale or deficient. Moreover, since Shea offered an opinion as to Plaintiff's limitations following his ankle surgery, it was incorrect for Plaintiff to assert, in his brief, that "the ALJ had no opinion evidence on which to assess the impact of Plaintiff's fractured ankle on his RFC, rendering the record incomplete."[18] The mere fact that the ALJ did not adopt every single limitation contained in Shae's report did not create a gap in the record. In sum, there was no need for the ALJ to develop the record further by obtaining additional medical opinion evidence.

Finally, Plaintiff contends that the ALJ impermissibly "cherry picked" limitations from Shae's report that supported the RFC finding while rejecting those that did not, without a sufficient explanation. However, the Court disagrees. The fact that the ALJ did not adopt every single limitation in Shea's report is not an indicator that she impermissibly cherry-picked evidence that supported her RFC finding while ignoring evidence that did not. Moreover, an ALJ is not required to specifically explain why she did not accept every single limitation contained in a particular medical opinion, where her decision is reasoned and supported by substantial evidence. *See, Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983) ("Although we do not require

---

[17] The notable exceptions are that the ALJ's RFC finding indicates that Plaintiff can lift *less* than Shae said but sit longer Shae than she said, and does not incorporate Shae's recommendation for breaks every two hours.
[18] Pl. Memo of Law at p. 23.

that, in rejecting a claim of disability, an ALJ must reconcile explicitly every conflicting shred of medical testimony, we cannot accept an unreasoned rejection of all the medical evidence in a claimant's favor.") (citations omitted).   Here, the Court finds both that the ALJ provided sufficient reasons for departing from Shea's opinion and that her decision is supported by substantial evidence.

## CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No. 12) for judgment on the pleadings is denied, Defendant's cross-motion (ECF No. 15) for the same relief is granted, and this matter is dismissed.   The Clerk of the Court is directed to enter judgment for Defendant and to close this action.

So Ordered.

Dated: Rochester, New York
         March 29, 2021

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge

17